JOHN W. MASURY, Appellant, v. WILLIAM H. WHITON, Respondent.

*Court of Appeals, November 27, 1888.*

Affirming 43 Hun, 638.

*Arbitration. Award.*—The award of an arbitrator cannot be set aside for mere errors of judgment as to the law or facts of the case submitted to him, if, in making the award, he keeps within his jurisdiction, and is not guilty of fraud, corruption or other misconduct affecting the award.

This is an action to set aside an award. The answer set up the award as a counterclaim. The trial court dismissed the complaint, and gave judgment for the defendant on the counterclaim.

Appeal from a judgment of the general term affirming a judgment entered upon a decision of the special term.

*John L. Hill*, for appellant.

*Moody B. Smith*, for respondent.

EARL, J.—The award of an arbitrator cannot be set aside for mere errors of judgment as to the law or facts of the case submitted to him. If in making his award he keeps within his jurisdiction and is not guilty of fraud, corruption or other misconduct affecting his award, then his award is unassailable. Perkins v. Giles, 50 N. Y. 22 ; Morris Run Coal Co. v. The Salt Co., 58 Id. 667 ; Fudickar v. Guardian Life Ins. Co., 62 Id. 392. Here there was not an atom of proof of any misconduct on the part of the arbitrator, and we are therefore confined to the inquiry whether he kept within his jurisdiction in making his award. To determine the scope of the submission, we

must scrutinize the pleadings in the action commenced by Whiton's executors against Masury, which was disposed of by the submission. The complaint, among other things, alleged the existence and continuance of the copartnership, and annexed thereto as a part thereof were the three written agreements under which the copartnership was founded and conducted ; that Masury, as survivor, took and had all the copartnership property ; that he had never made or rendered any account of the copartnership affairs except the semi-annual accounts regularly made out in the business of the firm, on the first days of January and July, in each year, as required by the copartnership agreement; that during the fall of 1875, and subsequently thereto, the plaintiffs called upon Masury for an account and for an inspection of the firm books, and that he absolutely refused to permit them to see or inspect the books, or to permit an expert to examine them until they had accepted two certain statements of account attached to the complaint, as exhibits D. and E., which Masury had rendered to them, and had also conveyed to him the firm real estate; that in the account made up by Masury for settlement there were certain errors and frauds, particularly specifying that the cost of permanent improvement to real estate and machinery was charged to expense account; that the merchandise taken by Masury, was not valued at the wholesale market price, as required by the copartnership agreement, and that goods were wrongfully valued in order to cut down profits, and that there was a dispute and difference as to certain interest, and an error in reference thereto ; that the business of the firm had been so far settled that a full, just and equitable accounting and settlement could then be had between Masury, as surviving partner, and Whiton's executors ; and relief was prayed that Masury be compelled to render an account as directed by the copartnership articles of agreement, and that Whiton's executors have judgment for any sum found due to them,

besides other and further relief. Masury in his answer al-
leged that he had rendered a true account of the partnership
busness and property and had paid Whiton's executors in
full for their share as shown by such account.

Now, under these pleadings, what matters were involved,
and could be the subject of investigation and litigation be-
tween the parties? Certainly all the accounts of the co-
partnership, which had not before been settled and adjusted
between the parties. The purpose of the action was to as-
certain how much was due to Whiton's executors from
Masury, and to compel payment of that sum; and such
plainly was the purpose and scope of the arbitration.

The award embraced three items, and we will now exam-
ine each item separately to see whether as to it the arbitra-
tor acted without jurisdiction.

*First.* In the complaint in the action of Whiton's Execu-
tors *v.* Masury, there is an allegation that a large amount
in the Titterton mortgage (so called), was still outstanding
and unsettled and that more than $5,000 was due from Mas-
ury to Whiton's executors for a deficiency on that mort-
gage. That was a mortgage taken from one of the em-
ployes of the firm for $10,000 to secure that amount of the
money of the firm embezzled by him. Masury claimed
before the arbitrator that that mortgage was taken by
Whiton's executors as a payment to them for that sum, and
they claimed they took it to apply as payment for only the
amount realized thereon, and that Masury was to allow
them one-half of any deficiency; and both parties sub-
mitted their evidence and claims in reference thereto to the
arbitrator. The mortgage was foreclosed and but little was
realized thereon, and the arbitrator charged Masury with
one-half of the deficiency. This was a matter clearly within
his jurisdiction and we cannot perceive that Masury has
any legal ground of complaint in reference thereto.

*Second.* The copartnership agreement provided that in
case of the death of either partner the survivor should suc-

ceed to the business of the firm and take the real estate, stock, fixtures, machinery, furniture and other assets of the firm; and under that provision Masury took all the manufactured goods the firm had at the death of Whiton, and he allowed for them in his account the estimated cost price thereof. Whiton's executors claimed that he should have allowed for them the wholesale market price, and .this matter of difference clearly embraced within the pleadings in the discontinued action was submitted to the arbitrator, and he determined that Masury should allow for the goods taken by him " the purchasable wholesale market price " thereof, and that the goods taken by him were worth on that basis $65,584.08, instead of $49,707.07, as claimed and allowed by Masury ; and he awarded to Whiton's executors one-half of the difference between these sums with interest. In so doing he acted within his jurisdiction and committed no error. The original copartnership agreement made July 1, 1857, provided that the survivor should take the goods " at the prices or value fixed as specified in the last inventory or account of stock taken by said partners previous to the decease of the party so dying, and any goods or assets not included in such schedule to be taken at the cost price." If this agreement had not been altered by the parties there would have been ground for Masury's contention.

But there was a second agreement dated January 1, 1865, which modified the prior one, in that it was provided that in case of the death of one of the partners the surviving partner should " render to the legal representatives of the deceased partner an account of the merchandise belonging to the firm, valuing it as the then purchasable wholesale market price of the goods, and shall pay for the same in the manner provided for by the original articles of copartnership," and that he should " take and pay for the store and fixtures, horses, carts, harness and house and lot in Madison Street, Brooklyn, at the cost price as shown by

the books of the firm." It was thus provided that the merchandise—manufactured goods—should be taken at "the purchasable wholesale market price," and that the other property mentioned should be taken at cost. What did the parties mean by "purchasable wholesale market price?" Clearly the wholesale price at which the firm sold its goods in the market. Masury was to become the purchaser of Whiton's interest in the goods, and hence the price to him was to be the same as that at which other purchasers at wholesale could purchase them of the firm who were the only wholesale dealers in the goods. There could be no purchase without a sale and no sale without a purchase, and hence there can be no difference between the "purchasable wholesale market price" and the "salable wholesale market price," and either form of expression must mean the same as the wholesale market price. It was not intended that the surviving partner should have the whole profit on the goods manufactured with the joint facilities, capital and skill of both partners. But it was intended that the relatives of the deceased partner should receive from the survivor what the goods could be sold for in the market at wholesale to other parties; and that was the basis upon which the arbitrator made his award. Such a construction of the agreement is by no means unreasonable, as the survivor was to have, with the property, an established business, with the good will thereof. The arbitrator heard the evidence and statements of the parties in reference to this claim, and we think it is plain that he did not exceed his jurisdiction in reference thereto.

*Third.* The only other item entering into the amount awarded is the sum of $5,000 and interest, connected with the valuation of the real estate, fixtures and machinery of the firm. The factory property stood upon the books of the firm at $90,436.17, the cost thereof. This included real estate, buildings, fixtures, machinery and other property, but no merchandise. On the 30th day of December, 1869,

less than two months before the death of Whiton, and when Masury knew that he was soon to die, and that he (Masury) would be the survivor and have as such all the property of the firm, he charged in writing the sum of $10,000 to the account of "factory property," on account of the wear and tear thereof, and thus diminished the value thereof as carried on the books to $80,436.17, and claimed the right to take this property at that sum. He made that claim before the arbitrators and gave evidence tending to show that it is customary for manufacturers to deduct ten per cent. annually for depreciation in machinery, fixtures and other articles used in their business.

The executors gave evidence before the arbitrator that they never assented to the charge of $10,000, and claimed that Masury had no right under the copartnership agreement to make the charge. The arbitrator sustained the contention of the executors, and in his award charged Masury with one-half of the $10,000 and interest thereon; and in this Masury claims that he exceeded his jurisdiction. In the first agreement it was provided that real estate, fixtures, machinery, etc., "should be taken by the survivor at the price or value fixed or specified in the last inventory or account of stock taken by the partners previous to the decease of the party so dying, and any goods or assets not included in such schedule to be taken at the cost price." This agreement remained in force until January 1, 1865, and during all that time this property was carried on the books and inventories at cost; and if Whiton had died before the latter date, and indeed at any time before December 30, 1869, it cannot be questioned that Masury would have been obliged to take the same at cost. But in the second agreement the intention of the partners to fix the cost price as the exclusive standard for the valuation of this property is made entirely clear. All reference to valuation in any inventory or account is omitted, and it is provided that "the surviving partner shall take and pay for the store, fixtures,

horses, carts, harness and house and lot in Madison street, Brooklyn, at the cost price as shown by the books of the firm;" that he shall take and pay for real estate in Plymouth street, Brooklyn, with factory and buildings thereon, boilers, machinery and fixtures; also the real estate in Bridge street, Brooklyn, with store-houses, stables and sheds thereon, at the cost price as shown by the books of the firm. Then in the last agreement, dated October 14, 1867, it is provided that the provisions of the prior agreement, relating to the taking by the surviving partner and paying " for the real estate, merchandise, fixtures, etc., at the cost price, as shown by the books of the firm, shall apply to the real estate, machinery and fixtures now held and owned by said firm."

In making these agreements, the partners were dealing with a matter with which they were perfectly familiar. They knew the value of the property and how much it had depreciated and would depreciate in value, and yet more than ten years after the first agreement was made, they are careful and particular to set up the cost price as the standard by which to measure the value of this kind of property to be taken by the survivor. What could they have meant by " cost price " except the price paid by them for the property or the cost to them? If they had meant the value, or the value appearing upon any inventory or in any account, or any other standard, they would have said so in plain language. They probably knew that the surviving partner, taking the business and good will of the firm, could afford to pay cost for the property.

But it is said that this matter was not submitted to the arbitrator. It is true that no mention is made of it in the complaint in the discontinued action. But it was not needful to mention it. Masury was bound to allow for this property the cost price. He might change its value upon the books. He might, for the purpose of increasing or diminishing profits, or any other purpose, make deductions

on the books from the cost price for depreciation for wear and tear. But that could not alter his liability as surviving partner. When Whiton died, he was bound to take this property and allow for it cost price, and how much, measured by this standard, he should allow to Whiton's executors, was involved in any final settlement he should make with them, and hence was clearly involved in the discontinued action and the submission. The proofs in reference to this matter were submitted to the arbitrator, and he did not exceed his jurisdiction in his award in reference thereto.

It was provided in the copartnership agreement that the copartners should once, in each year, or oftener, if necessary, "make, yield and render each to the other a true, just and perfect inventory and account of all the profits and increase by them, or either of them made, and of all loss by them or either of them sustained, and also of all payments, receipts and disbursements, and of all other things by them made, received or disbursed in their said copartnership business." It was admitted in the complaint in the discontinued action that Masury had rendered the regular semi-annual accounts regularly made out in the business on the first day of January and the first day of July in each year. But there was no allegation that these accounts were settled and accepted by Whiton or his executors. The force and effect to be given to these accounts was for the arbitrator. The evidence in reference to them was placed before him and his determination thereon is unimpeachable.

We have not noticed all the views taken in the exhaustive briefs submitted to us, but enough has been written to justify our conclusion that the judgment should be affirmed.

All concur.